UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:14-CV-00304-TBR

NAOMI SORRELL                                                                                    Plaintiff

v.

REGENCY NURSING, LLC, *d/b/a* REGENCY CENTER                         Defendant

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Defendant Regency Nursing, LLC *d/b/a* Regency Center's Motion to Enforce Arbitration Agreement. (Docket No. 5.) Plaintiff Naomi Sorrell has responded, (Docket No. 13), and Defendant has replied, (Docket No. 14.) Also pending before the Court are Plaintiff's Motion to Remand to State Court, (Docket No. 7), and Motion to Amend Complaint and for Expedited Trial, (Docket No. 8). These matters all are fully briefed and ripe for adjudication. For the reasons that follow, Defendant's Motion to Compel Arbitration, (Docket No. 5), will be GRANTED; Plaintiff's Motion to Remand, (Docket No. 7), will be DENIED; and Plaintiff's Motion to Amend Complaint, (Docket No. 8), will be GRANTED IN PART and DENIED IN PART.

### BACKGROUND

Plaintiff Naomi Sorrell executed a durable power of attorney (POA) on December 10, 2012, designating her daughter, Cynthia Bennett, as her true and lawful attorney. (Docket No. 5-2, at 1-4.) The POA outlined a number of authorities given to Bennett, including:

> To demand, sue for, collect, recover and receive all debts, monies, interest and demands whatsoever now due or that may hereafter be or become due to me (including the right to institute legal proceedings therefore).
>
> . . . .
>
> To make, execute and deliver deeds, releases, mortgages, conveyances and contracts of every nature in relation to both real and personal property . . . .

(Docket No. 5-2, at 1-2.) The POA provides additional incidental authority relating to the other authorities granted elsewhere in the POA. (Docket No. 5-2, at 2 ("To do and perform all acts necessary or incidental to the carrying out of the powers conferred . . . .").) The POA also contains a broad "catch all" provision, which provides:

> I hereby further grant unto my said attorney in fact full power in and concerning the above premises and to so any and all acts, including but not limited to the above, as fully as I could do if I were personally present, and I do ratify and confirm whatever my said attorney in fact shall lawfully do under these presents.

(Docket No. 5-2, at 3.)

On January 5, 2012, Sorrell was transferred to Defendant Regency Nursing, LLC *d/b/a* Regency Center *f/k/a* Regency Care and Rehabilitation Center (Regency). That same day, Bennett executed admission documents on behalf of Sorrell. Among those documents was a "Long Term Care Arbitration Agreement" (Arbitration Agreement). The Arbitration Agreement provides, in pertinent part:

> **AGREEMENT TO ARBITRATE "DISPUTES":** Any and all claims or controversies arising out of or *in any way* relating to this Agreement, the Admission Agreement or any of the Resident's stays at this Facility, . . . whether or not related to medical malpractice, including but not limited to disputes regarding the making, execution, validity, enforceability, voidability,

unconscionability, severability, scope, interpretation, preemption, waiver, or any other defense to enforceability of this Agreement or the Admission Agreement, whether arising out of State or Federal law, whether existing now or arising in the future, whether for statutory, compensatory, or punitive damages and whether sounding in breach of contract, tort or beach of statutory duties, regardless of the basis for the duty or of the legal theories upon which the claim is asserted, shall be submitted to binding arbitration.

(Docket No. 5-2, at 8.) The Arbitration Agreement also provided the right to rescind the agreement by providing written notice within 30 days of admission. (Docket No. 5-2, at 10 ("**RIGHT TO CHANGE YOUR MIND:** This Agreement may be cancelled by written notice . . . from you within thirty (30) calendar days of the Resident's date of admission. . . .").) The Arbitration Agreement recites that Bennett acknowledges having received a copy and that Bennett "has had an opportunity to read it and ask questions about it before signing." (Docket No. 5-2, at 11.) The Arbitration Agreement goes on to state:

> **Right to Consult with Attorney:** Please read this Agreement very carefully and ask any questions that you have before signing it. Feel free to consult with an attorney of your choice before signing this Agreement. Other facilities may or may not request residents to sign such an Agreement, and you have a choice as to which facility you desire to live in.
>
> **Waiver of Trial by Judge or Jury:** By signing this Agreement, the Parties are giving up and waiving their right to have any Dispute decided in a court of law before a judge and/or jury.

(Docket No. 5-2, at 11.) The Arbitration Agreement states that execution of the Arbitration Agreement is voluntary and not a condition of admission:

> **VOLUNTARY AGREEMENT:** If you do not accept this Agreement, you will still be allowed to live in, and received services in, this Facility.

(Docket No. 5-2, at 12.) Finally, the Arbitration Agreement concludes, just above the signature lines, with the statement:

> **BY SIGNING BELOW, THE UNDERSIGNED PARTIES CONFIRM THAT EACH OF THEM HAS READ <u>ALL SIX (6) PAGES OF THIS AGREEMENT</u> AND UNDERSTANDS THAT EACH HAS WAIVED HIS/HER OR ITS RIGHT TO A TRIAL, BEFORE A JUDGE AND/OR A JURY, AND THAT EACH OF THEM VOLUNTARILY CONSENTS TO ALL OF THE TERMS OF THIS AGREEMENT.**

(Docket No. 5-2, at 13.) Bennett initialed pages 1 through 5 and signed page 6 as Sorrell's legal representative. (Docket No. 5-2, at 8-13.)

Sorrell filed this action in Jefferson Circuit Court on March 14, 2014. (*See* Docket Nos. 1; 1-1.) Regency timely removed to this Court on April 10, 2014, on diversity grounds. (Docket No. 1.) Sorrell alleges three counts in her Complaint: (1) negligence and gross negligence in relation to the care she has received at Regency, (2) violations of long-term-care residents' rights pursuant to Ky. Rev. Stat. § 216.510 *et seq.*, and (3) breach of contract. (Docket No. 1-1, at 3-5.)

DISCUSSION

Regency moves to compel arbitration and stay these proceedings, and Sorrell moves to amend her complaint and to remand this action to state court. The Court will begin by addressing Sorrell's Motion to Amend Complaint, (Docket No. 8), and Motion to Remand, (Docket No. 7), before turning to Regency's Motion to Compel Arbitration.

## I. Sorrell's Motion to Amend Complaint and Motion to Remand

In her first Motion, Sorrell seeks to amend her Complaint to add nine corporate entities in the corporate chain above Regency. (Docket No. 8-1.) Regency states that it has no procedural objection to granting Sorrell leave to file her proposed amended complaint naming these entities as defendants. (Docket No. 11.) As such, and in accordance with Federal Rule of Civil Procedure 15(a)(2)'s policy that courts should freely grant leave to amend a pleading when justice so requires, the Court will GRANT Plaintiff's motion for leave to file an amended complaint, (Docket No. 8), and her Amended Complaint, (Docket No. 8-2), will be docketed in this matter.. In that same Motion, Sorrell also requests that the Court set an expedited trial date. (Docket No. 8-1, at 4.) In view of the Court's conclusions below relative to Regency's Motion to Compel Arbitration, Sorrell's request for an expedited trial date will be DENIED.

In her second Motion, Sorrell moves the Court to remand this action to Jefferson Circuit Court on the basis that "additional Unknown Defendants," will, when named, destroy this Court's diversity jurisdiction. (Docket No. 7-1, at 1.) (Docket No. 7-1, at 1.) Sorrell states that she "fully intends to discover [these Unknown Defendants'] identity and include them as litigants." (Docket No. 15, at 3.) Sorrell insists that "[i]n all likelihood . . . these defendants once identified are Kentucky residents." (Docket No. 7-1, at 1.)

"[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction may be removed by the defendant . . . to the district court . . . embracing the place where such action is pending." 28 U.S.C. §

1441(a). A federal district court has original diversity jurisdiction over an action between citizens of different states and where the amount in controversy exceeds $75,000, exclusive of interest and costs. *Id.* § 1332(a). Diversity jurisdiction requires complete diversity, meaning that no plaintiff and no defendant are citizens of the same state. *See U.S. Fidelity & Guar. Co. v. Thomas Solvent Co.*, 955 F.2d 1085, 1089 (6th Cir. 1992). There is no dispute here whether the amount-in-controversy threshold is satisfied. Instead, the question before the Court is whether diversity jurisdiction exists where Sorrell has named certain "Unknown Defendants," who, according to her, "[i]n all likelihood . . . are Kentucky residents." (Docket No. 7-1, at 1.)

It is well settled that the Court's diversity jurisdiction is established at the time of removal. *See St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 284, 289-90 (1938). The removal statute, 28 U.S.C. § 1441(b), provides that in determining whether an action is removable on the basis of diversity, "the citizenship of defendants sued under fictitious names shall be disregarded." The clear language of § 1441(b) is dispositive here. The Court will address the question whether Sorrell should be granted leave to file a subsequent amended complaint naming one or more nondiverse defendants if and when she moves for such leave. As of now, diversity exists, and Sorrell's Motion to Remand will be DENIED.

## II. Regency's Motion to Compel Arbitration

Regency moves the Court to compel arbitration and to stay this action pending the conclusion of arbitration proceedings. Sorrell argues that arbitration should not be compelled and offers two arguments as to why the Arbitration Agreement is not

enforceable: (1) that Bennett lacked the authority under the POA to bind Sorrell to arbitration, and (2) that Regency concealed that the Arbitration Agreement was optional and not a condition of Sorrell's admission to Regency. The Court will address each of Sorrell's arguments in turn.

### A. Bennett had authority to execute the Arbitration Agreement on behalf of Sorrell.

Congress enacted the United States Arbitration Act of 1925, more commonly referred to as the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1–16, in response to the common law hostility toward arbitration and the refusal of many courts to enforce arbitration agreements. The United States Supreme Court has since interpreted the FAA as codifying "a national policy favoring arbitration when the parties contract for that mode of dispute resolution." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008). The Supreme Court has further stated that the FAA's underlying purpose is to put arbitration agreements "upon the same footing as other contracts." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)). The FAA establishes a procedural framework applicable in both federal and state courts, and also mandates that substantive federal arbitration law be applied in both. *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265 (1995); *Southland Corp. v. Keating*, 465 U.S. 1, 16 (1984).

Section 2 of the FAA, which governs the enforceability of arbitration agreements, provides that a written agreement to arbitrate disputes arising out a contract involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. 9 U.S.C.

§ 2. Whereas § 2 mandates enforcement, § 3 permits a party seeking to enforce an arbitration agreement to request that litigation be stayed until the terms of the arbitration agreement have been fulfilled. 9 U.S.C. §§ 2–3. Section 4 goes on to provide the mechanism by which a party may petition a court to compel arbitration:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . . If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.

*Id.* § 4. Thus, before compelling arbitration, the Court "must engage in a limited review to determine whether the dispute is arbitrable." *Masco Corp. v. Zurich Am. Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004) (quoting *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003)). Such review, the Sixth Circuit advises, requires the Court to determine first whether "a valid agreement to arbitrate exists between the parties," and second whether "the specific dispute falls within the substantive scope of the agreement." *Id.* (quoting *Javitch*, 315 F.3d at 624).

Sorrell does not appear to argue that her claims fall outside the scope of the arbitration agreement; rather, she argues that no valid arbitration agreement exists between herself and Regency because the POA did not give Bennett the authority to enter into any arbitration agreement on her behalf. Thus, the first issue that must be

resolved is the proper scope of the POA and whether it encompasses the Arbitration Agreement.

"Because arbitration agreements are fundamentally contracts," the Court must "review the enforceability of an arbitration agreement according to the applicable state law of contract formation." *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943-44 (1995)). However, "the FAA preempts 'state laws applicable *only* to arbitration provisions.'" *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (2002) (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). "Therefore, state law governs 'generally applicable contract defenses . . . such as fraud, duress, or unconscionability.'" *Id.* (alteration in original) (quoting *Casarotto*, 517 U.S. at 687).

Sorrell relies principally on the Kentucky Supreme Court's recent decision in *Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581 (Ky. 2012). The facts in *Ping* are similar to those here in many respects. Like Bennett, Donna Ping also was the daughter of a woman admitted to a nursing home. Pursuant to a power of attorney, Ping signed all documents for her mother, including an arbitration agreement. After her mother died, Ping brought a wrongful death action against the facility. The nursing home demanded arbitration in accordance with the terms of the arbitration agreement that Ping signed on her mother's behalf upon admission to the facility. The Kentucky Supreme Court ultimately refused to compel arbitration, finding that the power of attorney did not vest Ping with authority to execute the arbitration agreement on behalf of her mother. *Id.*, at 586, 594.

The conclusion in *Ping* was based on the Kentucky Court's examination of the terms of the "General Power of Attorney" granted to Ping. That document granted Ping authority over two aspects of her mother's affairs: first, Ping was authorized to make financial decisions on behalf of her mother, including "acts pertaining to the management of [her mother's] property and finances," and, second, Ping was authorized "[t]o make any and all decisions of whatever kind, nature or type regarding [her mother's] medical care." *Id.* at 586-87 (second alteration in original). Although the power of attorney contained a "catch all" provision granting Ping the "full and complete power and authority to do and perform any, all, and every act and thing whatsoever requisite and necessary to be done, . . . as I might or could do if personally present," the Kentucky Court refused to find that this catch-all authorized Ping to execute the arbitration agreement. *Id.* at 586, 590-91. The Court reasoned that "[the] power of attorney relate[d] expressly and primarily to the management of [her mother's] property and financial affairs and to ensuring that health care decisions could be made on her behalf." *Id.* at 592 (second alteration in original). The Court further noted that the general catch-all provision, by its own terms, was limited to those acts "requisite and necessary." *Id.* The Court interpreted this language as limiting Ping's authority to those acts which were required or necessary to give effect to the financial and health care authorities expressly granted. *Id.*

Additionally, the Kentucky Court emphasized that the power of attorney did not authorize Ping to perform collateral acts with "significant legal consequences," such as to waive her mother's right to seek redress in a court of law. *Id.* at 593. On this point, the Court explained: "Absent authorization in the power of attorney to settle claims and

disputes or some such express authorization addressing dispute resolution, authority to make such a waiver is not to be inferred lightly. Here, nothing in [her mother's] power of attorney suggests her intent that Ms. Ping make such waivers on her behalf." *Id.*

Thus, the *Ping* Court concluded that the power of attorney only authorized Ping to make financial and health care decisions for her mother. The Court found that the decision to sign the arbitration agreement was not a health care decision because the execution of that agreement was not a prerequisite for her mother's admission to the facility. *Id.* The Court also concluded that the decision to execute the arbitration agreement was not a financial decision. *Id.* 594.

The case at hand is distinguishable from *Ping* in several significant ways. Most obviously, unlike the power of attorney in *Ping*, the POA here grants Bennett authority to act well beyond the categories of health care and financial decisions, including the authority "[t]o make, execute and deliver . . . contracts of every nature." (Docket No. 5-2, at 2.) Also unlike the power of attorney in *Ping*, the POA here grants Bennett the express authority "[t]o demand, sue for, collect, recover and receive all debts, monies, interest and demands whatsoever now due or that may hereafter be or become due to me (including the right to institute legal proceedings therefore)." (Docket No. 5-2, at 1.) Thus, the POA gives Bennett both a broad contract authority as well as the authority to perform acts with significant legal consequences.

Furthermore, the catch-all provision in the POA contains no limiting language as did the power of attorney in *Ping*—to the contrary, the POA specifically provides that Bennett's scope of authority is not limited to its recitation of specific powers but instead

grants Bennett the expansive authority "to do any and all acts, including but not limited to the above, as fully as I could if I were personally present." (Docket No. 5-2, at 3.) Read in light of *Ping*, the powers granted by the POA here are more than adequate to allow Bennett to execute the Arbitration Agreement and bind Sorrell to its terms. Although the POA does not expressly authorize Bennett to enter into arbitration agreements, the Court can find no reasonable interpretation of the POA that would limit her authority to do so on Sorrell's behalf.

Both this Court and the Eastern District of Kentucky have analyzed similar powers of attorney since *Ping* and reached the same conclusion. *See Oldham v. Extendicare Homes, Inc.*, 2013 WL 1878937, at *5 (W.D. Ky. May 3, 2013); *GGNSC Vanceburg, LLC v. Taulbee*, 2013 WL 4041174, at *8-9 (E.D. Ky. Aug. 7, 2013). And even more recently, the Kentucky Court of Appeals, in applying *Ping*, likewise concluded that a power of attorney similar to the POA here granted the authority to execute an arbitration agreement on behalf of a resident. *See Kindred Healthcare, Inc. v. Cherolis*, No. 2012-CA-002074-MR, 2013 WL 5583587 (Ky. Ct. App. Oct. 11, 2013), *motion for discretionary review filed*, 2013-SC-000759. [1]

---

[1] Although *Cherolis* has been designated "To Be Published," that decision is not yet final, and a motion for discretionary review currently is pending before the Kentucky Supreme Court. Intermediate state appellate courts' decisions are not binding on this Court but are "viewed as persuasive unless it is shown that the state's highest court would decide the issue differently." *In re Dow Corning Corp.*, 419 F.3d 543, 549 (6th Cir. 2005). At this juncture, it does not appear to this Court that *Cherolis* is inconsistent with *Ping* or would be decided differently if granted discretionary review. Therefore, to the extent *Cherolis* is relevant here, its reasoning supports the Court's conclusion, as well as the conclusions in *Oldham* and *Taulbee*.

For these reasons, the Court finds that Bennett had authority to execute the Arbitration Agreement on behalf of Sorrell and, therefore, to bind Sorrell to arbitrate her claims against Regency.

### B. The Arbitration Agreement is valid and enforceable.

Sorrell argues that even if the POA authorized Bennett to execute an arbitration agreement, the Court nonetheless should refuse Regency's Motion because Bennett was unaware that the Arbitration Agreement was optional. To this end, she urges that Regency should not be allowed "to benefit from its misleading presentation of the admission documents to Ms. Bennett." [2] (Docket No. 13-1, at 8.) In support of this argument, Sorrell has submitted Bennett's affidavit, in which Bennett states that she was "provided admission documents . . . for completion before Regency would accept Ms. Sorrell as its resident" and "instructed . . . to complete the documents." (Docket No. 13-3, at 1-2.) Bennett maintains that "[a]t no time during the execution of [the admission documents] did anyone acting on behalf of Regency identify that the Arbitration Agreement was optional [or] state that Ms. Sorrell would still be admitted as a Resident even if the Arbitration Agreement was not executed." (Docket No. 13-3, at 2.) She states she "believed from the presentation of the admission documents that the

---

[2] Sorrell's position on this issue is, to some degree, logically flawed. Bennett states in her affidavit that she believed the Arbitration Agreement was mandatory. (Docket No. 13-3, at 2.) She also states that she believes her authority under the POA is limited to managing Sorrell's finances and health care. (Docket No. 13-3, at 2.) In *Ping*, the Kentucky Supreme Court recognized that "where an agreement to arbitrate is presented to the patient as a condition of admission to the nursing home . . . the authority incident to a health-care durable power of attorney includes the authority to enter such an agreement." *Ping*, 376 S.W.3d at 593. Thus, if Bennett's belief that the POA limited her to making health care decisions and her belief that the Arbitration Agreement was mandatory both are correct, then she would have had the authority to enter into that agreement on Sorrell's behalf.

Arbitration Agreement was mandatory." (Docket No. 13-3, at 2.) Bennett further acknowledges that "since [she] thought all the documents signed on January 5, 2012, were mandatory prerequisites to admission, [she] did not read the Arbitration Agreement." (Docket No. 13-3, at 2.)

Regency, for its part, has submitted the affidavit of Lenora White, the Admissions Coordinator for Regency who oversaw the admissions process for Sorrell. (Docket No. 5-2, at 14-15.) White states that she explained the admission documents and the Arbitration Agreement to Bennett during the admissions process. White also states, "I explained to her that if she signed the optional arbitration agreement, the parties were agreeing that any disputes that might arise between Ms. Sorrell and Regency Center would be resolved through arbitration and would not go to a jury trial in court." (Docket No. 5-2, at 14.) White insists that both Bennett and Sorrell had an opportunity to read the Arbitration Agreement and to request a copy to take with them if they wanted a copy to review later. (Docket No. 5-2, at 14.)

Regardless of the conflicting recollections of Bennett and White, Sorrell cannot avoid the Arbitration Agreement simply because Bennett erroneously believed that the Arbitration Agreement was mandatory or because Bennett failed to read it before signing. As the Kentucky Supreme Court recently reaffirmed, "[i]t is the settled law in Kentucky that one who signs a contract is presumed to know its contents, and that if he has an opportunity to read the contract which he signs he is bound by its provisions, unless he is misled as to the nature of the writing which he signs or his signature has been obtained by fraud." *Hathaway v. Eckerle*, 336 S.W.3d 83, 89-90 (Ky. 2011) (alteration in original) (quoting *Clark v. Brewer*, 329 S.W.2d 384, 387 (Ky. 1959)). It is

not entirely clear whether Sorrell is alleging fraud or, instead, is arguing that the Arbitration Agreement is unconscionable because of the way it was presented to Bennett. The Court will briefly consider both possibilities.

To show fraud under Kentucky law, a plaintiff must establish six elements by clear and convincing evidence: that the defendant (1) made a material misrepresentation, (2) which was false, (3) which was known to be false or made recklessly, (4) which was made with inducement to be acted upon, (5) which the plaintiff acted in reliance upon, and (6) which caused the plaintiff injury. *Holifield v. Beverly Health & Rehab. Servs., Inc.*, 2008 WL 2548104, at *2 (W.D. Ky. June 20, 2008) (citing *United Parcel Serv. v. Rickert,* 996 S.W.2d 464, 468 (Ky. 1999)). Sorrell argues that Bennett was instructed to complete the admission paperwork but was not told that the Arbitration Agreement was optional. Notably, Sorrell does not say that Regency told Bennett that her signing of the Arbitration Agreement was a requirement for admission, only that the presentation of the admission documents left Bennett with that impression. Without more, these allegations are insufficient to establish fraud and to overcome the presumption that Bennett would exercise ordinary care by reading the documents she was signing. *See Cline v. Allis-Calmers Corp.*, 690 S.W.2d 764, 767 (Ky. Ct. App. 1985) ("[N]egligence in failing to read the contract prevents any reliance on oral representations at the time of signing."); *see also Mayo Arcade Corp. v. Bonded Floors Co.*, 41 S.W.2d 1104, 1109 (Ky. 1931) ("As a rule, if a party is able to read and has a chance to do so, but omits this precaution because of his adversarys' [sic] statements, as to the contents of the instrument, his negligence will estop him from claiming that the instrument is not binding." (citation omitted)). In sum, Sorrell simply

has not shown that Regency fraudulently induced Bennett to execute the Arbitration Agreement.

As for unconscionability, in Kentucky, "the doctrine of unconscionability is a 'narrow exception' to the fundamental rule that a 'written agreement duly executed by the party to be held and who had an opportunity to read it, will be enforced according to its terms.'" *Holifield*, 2008 WL 2548104, at *4 (quoting *Conseco Fin. Servicing Corp. v. Wilder*, 47 S.W.3d 335, 341 (Ky. Ct. App. 2001)). An unconscionable contract is "one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other." *Conseco*, 47 S.W.3d at 341 (citation omitted). "Substantive unconscionability 'refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent.'" *Id.* at 342 n.22 (citation omitted). Procedural unconscionability or "unfair surprise," on the other hand, "pertains to the process by which an agreement is reached and the form of an agreement, including the use therein of fine print and convoluted or unclear language." *Id.* (citation omitted).

Sorrell has not shown that the Arbitration Agreement here is either substantively or procedurally unconscionable. The Arbitration Agreement does not unreasonably favor one side; it merely sets the forum in which disputes are to be contested. Its terms are written in plain, easily understood language. It encourages consultation with an attorney before signing. It provides a 30-day window during which Bennett could have rescinded the agreement if desired. It states clearly and conspicuously in bold, underlined, all-capital letters, "VOLUNTARY AGREEMENT," followed by the single sentence, "If you do not accept this Agreement, you will still be allowed to live in, and

receive services in, this Facility." (Docket No. 5-2, at 12.) And just above the signature lines, it recites again in bold, all-capital lettering that the undersigned has read the entire agreement and understands that by signing she is waiving her right to a trial. (Docket No. 5-2, at 13.) Bennett does not claim that she did not have the opportunity to read the Arbitration Agreement; rather, she admits she simply did not read it. There is nothing to indicate that the Arbitration Agreement was hidden or concealed—indeed, the fact that Bennett initialed the first five pages before signing the last page indicates just the opposite. Even assuming that Regency did not identify the Arbitration Agreement or explain to Bennett that it was not a prerequisite for admission, Regency's failure to do so does not rise to the level of unconscionable conduct.

The Court thus finds no reason to deny Regency's Motion to Compel Arbitration on the basis of either fraud or unconscionability.

* * *

Therefore, having found that Bennett had authority to execute the Arbitration Agreement on behalf of Sorrell, that the Arbitration Agreement is valid and enforceable under the FAA, and that Sorrell's claims all are included within the terms of the Arbitration Agreement, the Court is required by the FAA to compel arbitration. Accordingly, Regency's Motion to Compel Arbitration, (Docket No. 5), will be GRANTED.

CONCLUSION

Having considered the parties' respective arguments and being otherwise sufficiently advised, for the foregoing reasons;

IT IS HEREBY ORDERED as follows:

(1) Sorrell's Motion to Amend Complaint, (Docket No. 8), is GRANTED IN PART and DENIED IN PART as follows:

   (a) Sorrell's motion for leave to file her amended complaint is GRANTED, and her Amended Complaint, (Docket No. 8-2), shall be docketed in this matter;

   (b) Sorrell's request for an expedited trial date is DENIED;

(2) Sorrell's Motion to Remand, (Docket No. 7), is DENIED;

(3) Regency's Motion to Compel Arbitration, (Docket No. 5), is GRANTED, and this matter shall be STAYED pending the conclusion of the arbitral proceedings in accordance with the terms of the Arbitration Agreement;

(4) The telephonic status/scheduling conference presently scheduled for May 30, 2014, at 12:30 p.m. (EDT) is CANCELLED.

IT IS SO ORDERED.

Date:


cc:     Counsel